Case 14-1742 Martinique Stoudemire v. MDOC et al. Oral argument, 15 minutes per side. Mr. Schneider for the appellant. Good morning your honors. May it please the court, counsel. Cliff Schneider from the Michigan Attorney General's office. On behalf of defendant appellant Susan Davis, I've asked to reserve 3 minutes for rebuttal. You may. Thank you your honor. The district court in this case relied on 4 facts to deny appellant Davis qualified immunity. Number 1, the segregation unit in the prison did not have handicapped cells. Number 2, Stoudemire was an amputee. Number 3, Davis knew that Stoudemire was in segregation. And number 4, Stoudemire had limited means to call for help. Those 4 facts alone are not enough to impose 8th Amendment liability against Davis. And the district court also ignored other uncontested facts. For instance, Davis knew that there was a handicapped bathroom available in the segregation unit that Stoudemire could be taken to. Davis knew that health care did rounds in the unit. Davis knew that staff was available to help Stoudemire transfer. And Davis knew that there was a shower available in the handicapped unit. The question here, whether the segregation unit actually did provide adequate accommodation for Stoudemire, is different than the question whether it could. And the question about whether it did, the facts going to that don't involve defendant Davis, appellant Davis. Davis is not a doctor, she was a prison warden. And in the prison, the health care services were split off and provided by the Bureau of Health Care Services. The chief medical officer testified in this case that if a prisoner required a medical accommodation, such as a handicapped bathroom or a bed trapeze, some type of medical device, it was health care's job to decide that the prisoner needed that. And health care would inform the custody staff, such as the warden, through a special accommodation notice or a medical detail. Were health care people also sued in this case, or just the warden? Your Honor, some prison nurses were sued. Some doctors who worked for the outside contractor were also sued, and they'll remain in the case and go to trial regardless of the outcome of this decision here. Okay, so this was on top of that. Okay. With regard to your raising that some of the things that might have been available were, at least in theory, available, those were all things outside of the cell, right? She would have had to call for help to get transported to them. Is that right? Correct, Your Honor. And in that case, wouldn't the problem with the call button make those not really available or not readily available? Well, Your Honor, we know that Stoudemire received help with her transfers on some occasions, and what she testified to was that she stopped asking for help with those transfers because she perceived staff as treating her rudely. There was one incident where a nurse accused her of malingering. Another nurse wrote B.S. in the medical record, apparently, in response to Stoudemire's complaint of chest pain. We also know that Stoudemire received at least one shower while she was in segregation. She was in segregation for what, several months? She was there for two weeks, Your Honor. Two weeks. Yes, and this was about 27 days after she had had her surgery. Now, taking all of Stoudemire's facts as true, the situation in segregation does look bad. Stoudemire says she was depressed. She was suffering from withdrawal symptoms. Someone denied her showers. We don't know who except for the one day that they let her go. The nurses told her to do her own dressing changes. A psychologist spoke to her from outside of her cell. Staff accused her of malingering. One nurse made her wait overnight for a complaint of chest pain. She missed the toilet once, and she stopped asking staff to help her transfer. But Davis didn't do any of those things. And Stoudemire didn't tell Davis about any of those things. There's no evidence. What is a warden's duty then? Nothing? Just to come up and say, not my job? Your Honor, what the warden did was she made rounds in the unit, and she testified that she checked the logbook to make sure that medical staff were doing rounds in the unit to check on Stoudemire. And the chief medical officer also testified that if Stoudemire did need some type of medical accommodation, it was health care's job to assign it and write a medical detail or special accommodation notice. That would be given to the custody staff, who the warden presides over. Why make rounds if she's just waiting for the medical staff to tell her if something is important or not? Well, Your Honor, in case the medical staff aren't doing their job and they're not making their rounds, Warden Davis was checking that logbook to make sure the nurses were signing off, that they indeed were in the unit doing rounds. Well, they should check with the patient too, right? Your Honor, Warden Davis had over 1,500 prisoners that she was... But not many that have no legs. No, Your Honor, I would say not many that had no legs. Could I take you back quickly? You started out by saying there were four points, and number four was the call button. I thought I missed number three. It really just tied number one and two together. Davis knew that Stoudemire was in segregation. These were the four facts that the district court laid out when it denied qualified immunity to Davis. And I think what the district court failed to do was consider all the other facts, such that Davis was not a doctor. She can't decide whether Stoudemire needs some type of special medical treatment. The doctor decides that. Okay, but so giving your best spin on these facts, doesn't that just take us back to the question of whether there is a genuine issue of material fact? And because this is an interlocutory appeal under Johnson v. Jones and those cases, isn't that the kind of issue that we don't get to decide the way that we usually would on a summary judgment? That is, you're making a decent case if this were a direct appeal on a summary judgment. But don't you read Johnson v. Jones as saying, if the issue is, was the district court correct about there being a genuine issue of material fact, then we can't consider that question. I don't think Johnson requires complete deference like that. I look at these inferences like circumstantial evidence. So if a person walks into a building and they're wet, a plaintiff might testify and a judge might infer that it was raining outside. A defendant might dispute that and say, no, he got hit by a sprinkler. In that case, that's Johnson, that's a question of fact. So the district court would be bound to resolve that inference in the plaintiff's favor. Our case here, we're accepting Stoudemire's version of the facts, and our case is more like Plumhoff v. Rickard. That's 134 S. Court, 2012. That's a Supreme Court case from 2014. That case involved a police chase where some officers were chasing a fleeing suspect in a vehicle. They eventually stopped him by crashing his vehicle. The suspect managed to get the car started and started moving again, at which point the officers opened fire and killed that suspect. Now the district court in that case had inferred that the chase was over when that car had stopped initially. But the Supreme Court reversed and did not accept that district court's inference because the facts there were not disputed. The facts were known, and what the district court had really done was decide the legal effect of what those facts really meant. Johnson involved the fact question whether officers beat the plaintiff in that case or whether, as the officers testified, they weren't even there. That was a he-said, she-said situation, and there was evidence sufficient to send that case to a jury to allow them to decide who they believed. The difference here in our case is that, yes, even if all these facts are true and these conditions and segregation were horrendous, Davis wasn't there. She wasn't the person who ignored Stoudemire's chest complaints or made her do her own dressing changes, or the health care personnel who decided she did not need a commode chair or bed trapeze. Johnson talks about interlocutory appeals should be reserved for abstract questions of law. Is there an abstract question of law here? There is, Your Honor, and I would frame it like this. If a plaintiff was lying on the floor in the hallway in the prison bleeding and the warden did not treat him, a district court might say, well, let's send it to a jury. But a district court can't ignore the other facts, such as maybe there's two nurses already looking at that bleeding plaintiff and there's an ambulance already on the way. And that's what our district court did here. He relied on a small set of facts, ignoring all the facts, such as Davis made sure health care was looking after Stoudemire, and Davis knew that there was, in fact, a handicap restroom available if needed. There was a shower available. So, again, I guess I'd just reiterate that whether Stoudemire's needs actually were met in the segregation unit is a different question than whether they could be. And Davis knew that they could be, and nobody ever told Davis that Stoudemire's needs were not actually being met there. Was she making rounds, or was she just looking in the book? Well, Your Honor, I believe she was making rounds. She would check the logbook to make sure that health care was making rounds. There's no question that she was in the unit. I'm not sure the record reflects whether she was actually looking into every cell. Davis did testify that she was familiar with her prison population. So at some point, I believe she testified, she would walk by the cells. I'm not sure that happened every day, though. Okay, but she definitely knew that this lady was a double amputee. Yes, Your Honor. So then, to the extent that the question is, should a double amputee be put into these segregation cells, she knew the basic problem, because, as you say, you're agreeing that the shower and the toilet were available, but not in the cell, so that she was going to have to be transported. Well, Your Honor, there was also an in-cell toilet, and Stoudemire says that she had trouble getting on and off the toilet without some sort of assistive device. That's no surprise, right? I think health care would have to decide. That was a question about the trapeze bar, right? I believe it would be a trapeze bar to get her from the bed to her wheelchair, and then, I guess, from her wheelchair she could slide to the toilet, maybe with the help of a commode chair. Again, medical devices that health care should have recognized the need for and prescribed to Ms. Stoudemire. Stoudemire did make it to the toilet on every occasion but once. She does say she missed the toilet once, so in some manner she was transferring regularly, perhaps with assistance, before she says that she stopped asking staff for assistance. It's not a trapeze bar alone that could help a disabled person transfer from a bed to a toilet. Staff could carry them or help them do that transfer. That's an equally adequate accommodation as opposed to a commode chair or a bed trapeze, and health care would have to decide if some actual medical device was needed in that situation. So health care is responsible for assisting someone to the toilet? In this situation, Your Honor, I believe that was what health care decided to do as opposed to prescribing some type of other medical device or physical change. But I'm not talking about prescribing the devices. Are you saying, is it undisputed that health care was responsible for implementing all assistance, regardless of whether it involved toileting or showering? Somebody from health care staff was supposed to be providing that. Your Honor, I don't believe it's fully clear in this record whether it was custody staff or health care staff that were helping her. But then why aren't there questions of fact? Your Honor, because the custody staff, those officers in the unit, aren't here on appeal. It's Warden Davis who was not the person in the unit to make sure that everything was going as planned. When you make that distinction, is it because she would have more direct responsibility for the custody staff or that she wouldn't have direct responsibility for them either? Well, Your Honor, under the supervisory liability line of cases, I don't believe she'd have direct liability for custody staff if they'd failed to do something they were supposed to do. Absent her approving it or knowing about it, which in this case, there's no evidence she even knew about it. Anything else? You'll have your time for rebuttal. May it please the Court, I'm Elizabeth Alexander. I'm here representing Plaintiff Studemeier. I want to clarify a couple things from the oral argument. First, one of the four points that defendants' counsel indicated was that the warden knew that staff were available to assist Ms. Studemeier. There's nothing in the record that supports that. As to the ability of health care to assist Ms. Studemeier, they were under the directive that is the Russell Memorandum, which is central to all of this. They were required to come to health care, to segregation, wherever she was, once per day. So whoever could have been assisting her, it would only have been once per day that it could have been health care to do that. And there's just no evidence that that happened. If you read the Studemeier Declaration, it doesn't say once she wasn't able to get to the toilet. It says two times, once for a bowel movement and once for urination. She had no ability to get there. And it was then that she gave up because of the difficulty of getting staff to come and started crawling to the toilet when she had to use it. And I'll get to this, I hope, in somewhat more detail later. Throughout the defendant's brief and the reply brief significantly, there are just all sorts of factual statements that I believe are unsupported in the record. The court lacks jurisdiction in this case. In Roberson in 770 Fed Third, the court noted that in the 2014 Plumhoff decision, the Supreme Court clarified its decision in Johnson v. Jones. The Roberson court held that it had jurisdiction in that case only because the appeal raised a legal issue that was conceptually distinct from the factual merits of the plaintiff's case. The court in Roberson was not asked to review at all the sufficiency of the evidence, which is indeed precisely what the court is asked to do in this case. Also in Romo v. Largan in 723 Fed Third, this court applied Johnson to explicitly reject the argument that in an interlocutory appeal like this, the court can review the factual inferences that the district court drew. The court in Romo refocused attention on the actual language of Johnson, which requires an appellate court to take as given the facts found by the district court. The only way the court has jurisdiction here is to reject Romo and to reject the rationale of Torres and indeed Johnson. And as to the Plumhoff decision, I believe that that is best understood as being either one or both, because I think it's not really clear, of a blatantly wrong Scott v. Harris decision or possibly there seems a lot of way to read it as simply anyone driving 100 miles an hour on an occupied highway, any use of force is reasonable. The only argument the defendants make in this case is a factual argument. The question presented reads, is Davis entitled to qualified immunity because she did not ignore any serious medical need? Ignore any serious medical need is precisely the factual question here. Davis' brief fails to discuss what the district court found in its opinion. It repeatedly fails to discuss the facts in the light most favorable to Studemeier. Davis specifically testified several times in her deposition, she followed the Russell Memorandum, the directive. The directive says that custody, the warden or her designee, is to determine where a MRSA patient is to be kept. It also requires notifying the warden when a MRSA patient is quarantined. It makes custody responsible for MRSA patients in quarantine getting a daily shower. Custody. Davis says her practice when a MRSA patient was in segregation was to make rounds, to check the log, separately to check the door card, to ensure that both. What is the door card and what's on it? The door card is something in which a staff member, typically custody, notes when he or she has made rounds of a particular cell. Now in the Michigan prisons, and I'm going outside the record here, I've seen door cards, they've been on individual cells, but they also could be gathered and could be at some other. Is it supposed to note when a shower, when the person was transported? That would be the log book. The log book. Okay. So that is something that if the person made rounds even to the log book, they would see that that wasn't happening. That's correct, Your Honor. When Davis read the log, she would have seen one shower during two weeks. And Davis knew that Studemeier had no legs. Sanitation is a serious medical need for MRSA patients because it's a skin infection. And indeed, among the topics that the directive that Davis said she followed are directions on special precautions to maintain proper wound care, prisoner and cell cleanliness to avoid spreading the infection, as well as that daily shower. Custody was responsible to provide the showers and to maintain cell cleanliness. Davis had U.S. Department of Justice training in the ADA, as well as Department of Corrections training and wardens' meetings about the subject. Davis also had training in the directive itself during the 2005 wardens' meeting. The directive requires that a prisoner with MRSA be placed somewhere not in contact with others. It does not specify placement in segregation. Indeed, at the time that Studemeier was transferred to segregation, she had been in a single cell in the infirmary. There is no reason she could not have stayed in that cell. And then she would have had accommodations. Then she would have had an emergency button. During her second MRSA infection, indeed, that's where she stayed, in the infirmary. Studemeier also could have been locked somewhere else in the facility to separate her from other prisoners. Davis admitted there were rooms, quote-unquote, all over the compound at Heron Valley Women's that were disabilities accessible. Davis admitted she knew she had the power to transfer Studemeier for medical or programming need. Her only reason that she gave in pushing back on that was it's not the practice. A reasonable jury could find that Davis was aware that Studemeier had no legs based on Davis' own statements. And Davis admitted she knew that segregation had no accommodation for disabilities. And here let me address the claim that there was a disabilities accessible bathroom in segregation. What Davis actually says is that there was a disabilities accommodation bathroom in the corridor. She doesn't say it was in the segregation unit. And the testimony by deposition and in his declaration of our medical expert, Dr. Walden, makes clear, as does in fact Studemeier's declaration, that there was no such disabilities accessible bathroom in the segregation unit. That bathroom was somewhere outside there. The bathroom that Dr. Walden was talking about, which by the way couldn't be used, was in a regular housing unit. Of course a jury might find either way on this. But this is a qualified immunity interlocutory appeal. In short, defendants counsel and I are simply today arguing about the facts here, which is precisely what the Supreme Court in Johnson v. Jones said was not this court's rule. And let me point out that even under the rationale of the concurring opinion in Romo v. Largan, plaintiff is entitled to win here. Because both of Davis' briefs have refused to concede Studemeier's version of the facts. Davis' main brief claims that the central office, not Davis, was responsible for Studemeier being in segregation. This is refuted by the Pramsteller deposition and the directive. Davis' brief also claims that there was a disabled accessible bathroom in segregation. Davis admitted there were no accommodations in segregation. There was a disabilities bathroom in the corridor. Similarly, the reply brief incorrectly challenges plaintiff's summary of Davis' ADA experience and says on the last page of it that Studemeier was able and did use the restroom in segregation without incident on most occasions. That conflicts with Studemeier's declaration that indicates that the only time she got to a toilet was a toilet in the cell. And defendant's claim, again, of that accessible bathroom is an error. If there are no further questions from your honors, I won't. Thank you. Mr. Schneider, you have your three minutes for rebuttal. Thank you, your honors. I would contest this idea that there were notations of showers in the logbook as something not in the record, something that's just not here before this court. Did the warden know that there was supposed to be a shower every day? Yes, your honors. The policy said shower every day. The warden knew that she was supposed to have a shower every day. But there's nothing in the record as to whether she had any way of monitoring that or any desire or practice to monitor that? Correct, your honors. Studemeier never told Davis, I'm not getting my showers. She never sent a letter to Davis or filed a grievance. I'm not getting my showers. Help me out, warden. It never happened in this case. I'd also just like to point out that the ADA is clearly not the same as the Eighth Amendment here. Whatever Davis' training was, which was the same training that all MDOC employees received on the ADA, would help her understand what types of accommodations would be available, not necessarily what's required by the Eighth Amendment, which is, I think, something less, and a helper transferring to a toilet certainly meets the Eighth Amendment standard. As far as the availability of that handicapped bathroom, whether it was in the unit or in the corridor, Davis said she knew it was there and available for Studemeier to be taken to it if needed. I'd just like to reiterate, we know the facts of this case. We're accepting Studemeier's version of the facts. The part about knowing that there was no call button or emergency button, whatever they call it, was that pursued further in the record in the sense that it would seem that on the one hand, with a double amputee, you would understand that that would be particularly important, but on the other hand, if you had that, then all of this other available help that you press would be much more persuasive. Was there anything about why they couldn't get a call button for this particular case or they never thought about that? Your Honor, we have to accept Studemeier's version of the facts as true, that it wasn't there. What we do have in the record, though, is that she was placed in cell number one next to the officer's desk. So unless the Court has any further questions, thank you for your time. Thank you, Counsel. The case will be submitted. The Clerk may call the next case.